**MEDMARC CASUALTY INSURANCE COMPANY, Plaintiff,**

v.

**The REAGAN LAW GROUP, P.C. and Mary Kathryn Reagan, Defendants.**

**Civil Action No. 1:06–CV–00773–MHS.**

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 6, 2007.

Emory Livingston Palmer, W. Pitts Carr, Carr Tabb Pope & Freeman, Atlanta, GA, R. Scott Christopher, Law Office of Robert R. Pagniello, Decatur, GA, for Plaintiff.

The Regan Law Group, P.C., Alpharetta, GA, pro se.

Anthony Brackett Sandberg, The Sandberg Law Firm, Atlanta, GA, for Defendants.

Mary Kathryn Reagan, Alpharetta, GA, pro se.

## ORDER

MARVIN H. SHOOB, Senior District Judge.

Before the Court is a motion for summary judgment by plaintiff, Medmarc Casualty Insurance Company ("Medmarc"), seeking rescission of the professional liability insurance policy issued by Medmarc to the defendant, The Reagan Law Group, PC ("the Reagan Law Group"). For the reasons stated below, the Court grants plaintiff's motion for summary judgment.

*Background*

This case arises from an insurance policy issued by plaintiff Medmarc to defendant the Reagan Law Group upon the application by defendant Mary Kathryn Reagan. At the time plaintiff issued the policy in controversy Ms. Reagan practiced law, primarily as a real estate closing attorney, through her firm, the Reagan Law Group.

The disputed "claims-made" policy was issued by plaintiff Medmarc to the named insured, the Reagan Law Group, on May 12, 2006. The policy covered claims received by Ms. Reagan relating to her rendering of "Professional Services" as an attorney. The applicable policy period was from May 3, 2005, to May 3, 2006. The policy also included retroactive coverage dating back to May 3, 1999. While Ms. Reagan had purchased several such claims-made policies over the years, at the expiration of each policy period she was required to submit a new application. The purpose of the re-application was to allow Medmarc's underwriting department to assess any risks that might stem from the issuance of a renewal policy.

The application for renewal contained the following question: "At this time, does any applicant know of any act, or omission or circumstance that could reasonably give rise to a professional liability claim against any of the following: the firm, any past or present attorneys in the firm, or any predecessor firm?" In response to this question, Ms. Reagan replied "No." Subsequently Ms. Reagan signed a "Notice of Acceptance" indicating that she accepted the terms of plaintiff's policy and that she was "not aware of any claims and/or circumstances, acts, errors or omissions that could result in a professional liability claim since the completion of my/our last application."

Plaintiff submits that these statements by Ms. Reagan were objectively false and constituted material misrepresentations. According to plaintiff, Ms. Reagan had been engaging in a course of conduct for several years, reflected in the flagrant mismanagement and abuse of her attorney trust fund, that rendered her representations on the application for insurance objectively false. Plaintiff submits that the information withheld by Ms. Reagan during the application process was material in that it altered the risk landscape as to Ms. Reagan at the time the policy was issued.

Medmarc seems to have become aware of the problems with Ms. Reagan's practice in the summer of 2005. In July and August of 2005, several individuals filed complaints against Ms. Reagan with the State Bar of Georgia after receiving bad checks drawn on her attorney trust account in the context of real estate closings.

Plaintiff agreed to pay for Ms. Reagan's defense under a reservation of rights. Thereafter, plaintiff undertook an audit of Ms. Reagan's trust account, which lead to the initiation of the present suit. Ms. Reagan is currently under voluntary suspension by order of the Georgia Supreme Court pending the outcome of the complaints against her.

Plaintiff Medmarc filed suit on April 3, 2006. In Count I of its complaint, plaintiff seeks rescission of the policy on the grounds that Ms. Reagan made false and material statements in her application for insurance. Alternatively, in Count II plaintiff seeks a declaratory judgment that coverage is not available under the policy for certain claims. On August 1, 2007, Medmarc filed its second motion for summary judgment, which is presently before the Court.

█ On September 2, 2007, the Court granted Ms. Reagan's motion for an extension of time to respond to the instant summary judgment motion. Defendants, however, have not filed a response. While plaintiff's second motion for summary judgment is deemed unopposed, LR 7.1B, NDGa., the Court must consider the complete record to determine whether plaintiff is in fact entitled to judgment as a matter of law. *See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir.2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion"). Prior to proceeding to a discussion of the relevant law, therefore, the Court will examine the record, including defendants' response to plaintiff's first motion for summary judgment.

### Plaintiff's First Motion for Summary Judgment

Plaintiff Medmarc filed its first motion for summary judgment on December 29, 2006. In that motion, plaintiff sought rescission of defendants' professional liability policy on the basis of the flagrant pattern of irregularities in Ms. Reagan's attorney trust account documented by their expert, Thomas M. Huhn, a certified fraud examiner and forensic accounting investigator. Huhn reviewed Ms. Reagan's real estate closing files, computer files from Landtech,[1] and bank statements from Ms. Reagan's attorney trust account.[2] Ms. Reagan provided all of these documents to plaintiff upon their request. Informed by the fact that Ms. Reagan's trust account routinely reflected a negative balance and that several checks paid out in real estate closings had been returned for insufficient funds, Huhn focused on discovering the root of the recurring negative balances.

Huhn identified a pattern wherein Ms. Reagan was paying out money for apparently legitimate reasons during real estate transactions and later voiding the checks and reissuing the checks payable to the Reagan Law Group. In each of these transactions, the payments to the Reagan Law Group from the trust account were not reflected in the settlement statements. In his affidavit, Huhn detailed nine such transactions and provided supporting documentation in the form of the Landtech records, the voided checks, and the settlement statements for each transaction.

---

1. Landtech is a software program used to manage real estate transactions. According to plaintiff, the purpose of the software is to assist real estate lawyers in managing their attorney trust accounts.

2. Regions Bank Account No. 6556518117 is an IOLTA Account in the name of M.K. Reagan and Associates PC.

One problematic transaction that plaintiff described with detail involved a real estate closing conducted by Ms. Reagan for a property in the Big Canoe development in Pickens County on July 11, 2003.[3] In this deal, Ms. Reagan prepared a warranty deed conveying the property and a security deed for the buyer's mortgage. She also collected $380.00 from the seller, which was the appropriate transfer tax amount. About a year later when the buyer was refinancing his home, he learned that the deeds were never recorded following the closing. He wrote Ms. Reagan on August 15, 2004, and asked her to correct the problem. The warranty deed was finally recorded on March 3, 2005. The Reagan Law Group also submitted a state tax form indicating that the transfer had occurred as a "deed of gift."[4] This characterization was blatantly false, however, because the settlement statement reflects that the transfer occurred by way of a warranty deed for a sale price of $380,000. In addition to being false, the characterization seems to have also been self-serving; Ms. Reagan's firm appears to have retained the designated transfer tax funds.

To support the proposition that Ms. Reagan was aware of the problems with her attorney trust account, plaintiffs included the testimony of Scott Zillweger, a paralegal for the Reagan Law Group during much of the relevant time period. He testified that he was aware of several communications from the bank to Ms. Reagan regarding the overdrawing of her attorney trust account. He also testified that Ms. Reagan instructed him to delay paying off mortgages that were supposed to be paid upon closing for fear that the trust account contained insufficient funds to cover the checks.

In addition, plaintiff discussed problems Ms. Reagan experienced with two title insurance companies for which she was an agent, Stewart Title Insurance Co. ("Stewart Title") and United General Title Insurance Co. ("United General Title"). United General Title revoked Ms. Reagan's title agency in March of 2004, and plaintiff argued that Ms. Reagan should have divulged the circumstances underlying this dispute on her application for insurance. Ms. Reagan's dispute with Stewart Title initially concerned her lack of cooperation in the face of Stewart Title's attempted audit of her attorney trust account. Stewart Title subsequently cancelled Ms. Reagan's agency agreement and filed a lawsuit in Fulton County Superior Court to compel the Reagan Law Group to return its files.[5] Medmarc argued the circumstances leading up to Stewart Title's claim, like the other claims previously mentioned, indicated Ms. Reagan's law practice was in a state of disarray.

### Defendants' Response to Plaintiff's First Motion for Summary Judgment

Following three extensions of time, defendants responded to plaintiff's first motion for summary judgment on February 26, 2007. Defendants included affidavits from Ms. Reagan's psychiatrist, divorce lawyer, and a co-worker regarding the personal difficulties she was facing during the time of the disputes with Stewart Title and United General Title. More relevant to

---

**3.** The facts surrounding the Big Canoe transaction are supported by affidavits from Gail Brown (Clerk, Pickens County Superior Court); James D. Mallory, Jr. (seller); and John C. Herzler, Sr. (buyer).

**4.** In Georgia a transfer tax is due on any property sold for more than $100. O.C.G.A. § 48–6–1. Properties transferred by a "deed of gift" are exempt from the transfer tax requirement, however. O.C.G.A. § 48–6–2(a)(2).

**5.** Stewart Title's motion to intervene in the present action was denied by the Court on September 11, 2006.

the present motion, however, is Ms. Reagan's analysis of the Huhn report. Ms. Reagan argued that the alleged discrepancies uncovered by Huhn in relation to her attorney trust account and her closing records could not be evaluated without reference to the records from her firm's operating account. Neither counsel for plaintiff nor Mr. Huhn ever requested such operating account records from Ms. Reagan. She explained that high volume closing attorneys such as herself often experienced disparities in their trust account balance sheets due to the timing of various transfers of funds in and out of the account. Ms. Reagan argued that these types of circumstances constituted a normal part of a closing practice and were not significant enough to warrant reporting on an application for professional liability insurance.

Ms. Reagan also provided some explanation for her practice of voiding checks issued in conformity with settlement statements and reissuing the checks made out to her firm. In her affidavit, Ms. Reagan testified that this practice was used if it was determined that the checks cut at closing did not accurately reflect the amounts to be paid, because it was more expedient to issue a new check from the operating account than to go back into the Landtech system and remedy the situation. According to defendants, the checks issued to the firm account from the trust account were therefore merely by way of refund. Defendants also argue that the inconsistencies pointed out by Huhn were *de minimus* in light of the total closing values handled by defendants during the time period at issue.

Ms. Reagan also challenged the assertions of her former employee, Scott Zill-

weger. She argued that his testimony was not credible for several reasons, including his prejudice against Ms. Reagan after being terminated for cause for viewing pornography at work and failing to carry out his duties. She also explained that the limited nature of Mr. Zillweger's duties while employed at The Reagan Law Group would have prevented him from forming reliable opinions regarding the state of her attorney trust account.

Ms. Reagan also denied any wrongdoing with regard to the Big Canoe property. She testified that it was the duty of Mr. Zillweger to record deeds following a closing and that any error in this regard would have been his and his alone. She stated that she did not become aware of his failure to record the deed until she saw the buyer's letter concerning the omission well after the date of the letter.[6] Ms. Reagan also denies submitting the tax form indicating that the property was transferred by "deed of gift." She stated that she had never submitted an on-line tax form similar to the one submitted in this transaction therefore it could not be attributed to her. She surmised that Mr. Zillweger chose the tax-exempt designation to avoid having to ask her for a check to cover the transfer tax, which would have alerted her to his failure to file the deed in a timely fashion.

*Plaintiff's Second Motion for Summary Judgment*

In preparation for its first motion for summary judgment plaintiff relied on the bank records provided by Ms. Reagan. Out of an "abundance of caution" plaintiff requested a certified copy of the statements from Regions Bank pertaining to Ms. Reagan's trust account. Upon reviewing the records, plaintiff discovered dis-

6. In her affidavit, Ms. Regan indicates that the letter from the buyer was dated August 15, 2005. The letter was actually dated August 15, 2004. This mistake is important insofar as it makes it less likely that Ms. Reagan was unaware of the omission in April of 2005 when she was filling out the application for insurance.

crepancies between the statements provided by Ms. Reagan and those produced by the bank. In particular, the certified bank statements reflected numerous substantial payments from the trust account to American Express. At this point, plaintiff sought leave to re-open discovery for the limited purpose of investigating the issue of the American Express payments. The Court granted plaintiff's request to conduct additional discovery and denied the first motion for summary judgment with leave to re-file. During the extended discovery period, plaintiff deposed Ms. Reagan on the subject of the discrepancies between the certified bank statement and the documents she provided to plaintiff. As she was facing pending criminal charges regarding a mortgage fraud conspiracy, Ms. Reagan asserted her Fifth Amendment rights on the advice of counsel and did not provide any explanation regarding the trust account.

Plaintiff subsequently filed the present motion for summary judgment, which is primarily supported by the affidavit of forensic accounting investigator, Huhn, discussed above. The Big Canoe transaction is also recounted in detail.

In addition plaintiff has included support for its initial finding that Ms. Reagan made payments directly from her attorney trust account to pay her American Express credit card bills over forty times, beginning in December of 2001.[7] The payment amounts ranged from $589.37 to $54,672.14. Ms. Reagan made a payment of $48,534.14 from her attorney trust account to American Express just nine days before she completed the application for insurance. In addition, plaintiff supported its allegation that Ms. Reagan had attempted to cover up these American Express payments by altering the statements provided to counsel.[8] Ms. Reagan's payments from her trust account to American Express financed lavish shopping sprees and international vacations over a period of several years.[9] Due to her manipulation of her trust fund account, the balance was often insufficient to cover the numerous checks written by Ms. Reagan in real estate closings. In January of 2004, for example, ninety checks drawn on Ms. Reagan's trust accounts were returned for insufficient funds.

Medmarc has supplied an affidavit from Emily Sillman, the Underwriting Manager responsible for reviewing and making a determination regarding Ms. Reagan's re-application for professional liability insurance in April of 2005. Ms. Sillman stated that, had she known of the egregious mismanagement of Ms. Reagan's attorney trust account she would not have authorized the issuance of the professional liability policy because problems of this type are indicative of a "poorly managed practice" and constitute "a serious underwriting risk." Ms. Sillman also cited the American

---

**7.** Plaintiff has submitted certified bank records and the corresponding certified American Express credit card statements for the Corporate Platinum Card in the name of Mary Kathryn Reagan/The Reagan Law Group.

**8.** Tim Thorson, an Operations Manager with Regions Bank, testified that the appearance of the American Express transactions on the bank records provided to plaintiff by Ms. Reagan indicated that they had been altered. Thorson Aff. ¶ 6. The American Express payments appear on the certified bank statements with the designation "ELEC REMIT AMERICAN EXPRESS." In the bank statements provided by Ms. Reagan, however, the phrase "Wire Trans Reg Wire Dept" corresponds with dates and amounts of the American Express transfers. Id. ¶¶ 4–5.

**9.** For example, Ms. Reagan's American Express statements during this period reflect the following purchases at the designer shoe boutique Bob Ellis Shoes: (1) $6,499.18 on January 31, 2002; (2) $6,785.94 on April 6, 2002; and (3) $1,947.40 on August 9, 2002.

Express payments and apparently fraudulent transfer tax filing as circumstances that would have induced her either to decline to issue the policy or to issue it under different terms.

As stated previously, defendants have not responded to plaintiff's second motion for summary judgment containing the allegations surrounding Ms. Reagan's American Express payments.

## Summary Judgement Standard

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time· for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant bears the initial responsibility of asserting the basis for his motion. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity National Bank,* 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing' that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

A fact is material when it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## Discussion

Plaintiff has argued that it is entitled to rescission pursuant to O.C.G.A. § 33–24–7(b)(2). To prevail on a claim under this provision, plaintiff must prove that: (1) defendant made a false statement consisting of "either a misrepresentation, omission or incorrect statement of facts" in

her application for insurance; and (2) the false statement "was material because it changed the nature, extent, or character of the risk." *Home Indem. Co. v. Toombs,* 910 F.Supp. 1569, 1574 (N.D.Ga.1995) (internal quotation marks omitted).

 The Court finds that Ms. Reagan made a false statement on her application for insurance when she indicated that she did not "know of any act, or omission or circumstance that could reasonably give rise to a professional liability claim." Plaintiff does not need to prove that Ms. Reagan was acting with intent to deceive Medmarc when she filled out the application nor does plaintiff have to show that Ms. Reagan actually knew that her conduct could give rise to claims against her. *See Marchant v. Travelers Indem. Co.,* 286 Ga.App. 370, 374, 650 S.E.2d 316 (2007). Her alleged good faith is irrelevant. *See id.*

Ms. Reagan made over forty payments, amounting to over $700,000, to American Express directly from her trust account preceding her application for insurance. It is clear that such conduct could reasonably give rise to a professional liability claim. The Georgia Supreme Court "takes very seriously a lawyer's responsibility to safeguard and properly manage client funds." *In the Matter of Hamilton,* 281 Ga. 556, 556, 640 S.E.2d 291 (2007). The Georgia Rules of Professional Conduct prohibit an attorney from utilizing funds from an attorney trust account for personal uses. Ga. R. & Regs. St. Bar 4–102(d), 1.15. The maximum penalty for violation of this rule is disbarment. *Id.* Comment [1]. The court recently disbarred an attorney under this provision after he wrote two checks from his attorney trust account to pay off his personal Mastercard ac-

count.[10] *In the Matter of Brown,* 280 Ga. 500, 500, 629 S.E.2d 813 (2006); *see also In the Matter of Goldberg,* 281 Ga. 168, 635 S.E.2d 750 (2006) (disbarring attorney after he wrote a check for personal uses from attorney trust account).

The record includes certified copies of statements from Ms. Reagan's trust account at Regions Bank showing the payments to American Express as well as her American Express statements indicating receipt of the wire payments. Ms. Reagan has offered no explanation for this seeming flagrant abuse of her fiduciary responsibilities with regard to her clients' funds. Because the facts regarding the American Express payments are not in dispute, the evidence establishes as a matter of law that Ms. Reagan made an objectively false statement in her application for insurance.

The Court also concludes that the general disarray of Ms. Reagan's trust account, reflected in the frequency with which checks drawn on the account were returned for insufficient funds, was a circumstance that could have reasonably lead to professional liability claims. *See In the Matter of Fraser,* 280 Ga. 56, 56, 622 S.E.2d 337 (2005) (suspending attorney after he wrote six checks from his attorney trust account that were returned for insufficient funds); Ga. R. & Regs. St. Bar 4–102(d), 1.15 (detailing attorney's notification obligations under Georgia Rules of Professional Responsibility in the event that trust account is overdrawn). While the Court accepts that an occasional overdraft would be not be cause for alarm, ninety checks drawn on Ms. Reagan's account were returned for insufficient funds in a single month.[11] These were circumstances under which one reasonably should

---

**10.** In meting out the maximum penalty, the court also considered that Mr. Brown's disciplinary record contained a prior suspension for misuse of client funds.

**11.** These checks are reflected in the version of the Regions Bank statements that Ms. Reagan provided to plaintiff.

have expected claims to accrue by parties to real estate closings who held dishonored checks.

Thus Ms. Reagan's failure to mention the American Express payments and the persistent insufficiency of her trust account balance amounted to the making of "false statements" in an application for insurance under O.C.G.A. § 33–24–7(b)(2).[12]

The second part of the inquiry under O.C.G.A. § 33–24–7(b)(2) involves determining whether the false statements were material to the risk assumed by the insurer. Materiality is evaluated from the perspective of a prudent insurer. *Lively v. S. Heritage Ins. Co.*, 256 Ga.App. 195, 196, 568 S.E.2d 98 (2002). If a court finds that the record excludes every reasonable inference to the contrary, it may hold that the misstatements are material as a matter of law. *See United Family Life Ins. Co. v. Shirley*, 242 Ga. 235, 236, 248 S.E.2d 635 (1978).

Plaintiff submits that "[n]o underwriter in their right mind would offer insurance to a lawyer who was stealing money from a trust account." Pl.'s Br. at 17. The affidavit of Ms. Sillman, the underwriting manager responsible for providing final approval for Ms. Reagan's application is also offered in support of the materiality of Ms. Reagan's false statements. She testified that she would not have approved Ms. Reagan's application if she had known about the American Express payments and that money had been paid out of the trust account in ways inconsistent with closing statements. In support of this assertion, she cited the fact that courts are extremely intolerant of this type of con-

duct and that trust account problems are usually an indicator of a poorly managed practice (which constitutes an underwriting risk). On account of Ms. Sillman's affidavit, coupled with the flagrant nature of Ms. Reagan's conduct with regard to her trust account, the Court finds that Ms. Reagan's misrepresentations were material as a matter of law. *Nappier v. Allstate Ins. Co.*, 961 F.2d 168, 170 (11th Cir.1992) (finding that misrepresentation was material on the basis of underwriter's affidavit); *cf. Lively v. S. Heritage Ins. Co.*, 256 Ga.App. 195, 196, 568 S.E.2d 98 (2002) (finding that materiality was not established where underwriter's affidavit contained only blanket statements that underwriter would not have issued policy had misrepresentations been known to him).

*Summary*

Based on the foregoing analysis, plaintiff is entitled to rescission of the professional liability insurance policy in controversy pursuant to O.C.G.A. § 33–24–7(b)(2). Accordingly, the Court GRANTS plaintiff's second motion for summary judgment [# 72] as to rescission and DISMISSES AS MOOT Count II of the complaint seeking declaratory judgment. The Court also DENIES plaintiff's request for oral argument [# 73]. This action is HEREBY DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

12. Because the facts are not in dispute as to the American Express payments and the persistent overdrafts in Ms. Reagan's trust account, the Court will not discuss the potential grounds for rescission in the Big Canoe transaction and Ms. Reagan's practice of reimbursing the firm's operating account from the trust account. It is therefore unnecessary to determine whether Ms. Reagan has created a genuine issue of material fact as to these issues.